Court of Appeals
Fourth Court of Appeals District of Texas
San Antonio


# OPINION

No. 04-10-00044-CV

**IN THE ESTATE OF** Dennis M. **VACKAR**, Deceased

From the Probate Court No. 2, Bexar County, Texas
Trial Court No. 2007PC3440
Honorable Tom Rickhoff, Judge Presiding

Opinion by:   Rebecca Simmons, Justice

Sitting:   Karen Angelini, Justice
Phylis J. Speedlin, Justice
Rebecca Simmons, Justice

Delivered and Filed:  March 9, 2011

AFFIRMED IN PART & REVERSED IN PART AND RENDERED

Magdalen "Maggie" Marbry appeals the trial court's judgment, which invalidated the Statutory Durable Power of Attorney and Last Will and Testament of her brother, Dennis Vackar.  She also appeals the jury's finding that Dennis's gift of life insurance proceeds to her was unfair.  We affirm in part and reverse in part.

## BACKGROUND

On July 28, 2007, Dennis suffered a severe spinal injury when he fell approximately eight feet from the bucket of a front-end loader while he was trimming trees.  At the time of the accident, Dennis was estranged from his wife of twenty-seven years, Betty Vackar.  Their marriage had been "rocky" for at least five years.  Dennis's relationship with his son, Dustin,

was also estranged due to Dustin's relationship with his girlfriend and a prior physical altercation between him and Dustin; they had not truly spoken in approximately three years.

Betty believed that many of her marital problems were related to Dennis's close relationship with Maggie. Maggie was Dennis's confidant, and when Dennis was forced to choose between Maggie and Betty, he would choose Maggie. Betty was also annoyed that Dennis chose to travel every year with his sister instead of her.

In March of 2006, unbeknownst to Dennis, Betty began moving items out of the residence into a storage shed. Seven months later, while Dennis was traveling with Maggie in Morocco, Betty began moving personal items out of the residence into a one-bedroom apartment she had rented. When Dennis returned, Betty picked him up at the airport, drove him to their house, and told him that she had moved out. Betty and Dennis never lived together as husband and wife after October of 2006.

Immediately after falling, Dennis requested that Maggie and his brother Steve be contacted; he did not request that either Betty or Dustin be notified. A helicopter transported Dennis to University Hospital in San Antonio. As a result of the fall, Dennis suffered a serious spinal cord injury resulting in partial paralysis and the necessity of a ventilator. The hospital staff suggested to Dennis that he execute a medical power of attorney, and Dennis indicated that he wanted Maggie to be his agent. Dennis also requested that Maggie put her name on his checking account so that she could take care of his business while he was in the hospital.

Dennis executed a durable statutory power of attorney while in the hospital. Using the power of attorney and pursuant to Dennis's request, Maggie named herself as the beneficiary of Dennis's John Alden life insurance policy. Notably, prior to the accident, Dennis designated

Maggie as the beneficiary of his retirement funds and a Dearborn life insurance policy. While at the hospital, he also executed a Last Will and Testament leaving all of his property to Maggie.

Dennis's health declined, and he was ultimately transferred to a rehabilitation facility. Following several months of care, Dennis decided to discontinue his treatment and withdraw all supportive care. Before discontinuing treatment, the hospital's medical ethics committee confirmed that Dennis was competent to make such a decision. Dennis died shortly after the hospital withdrew his life support.

Maggie filed an application in probate court to probate Dennis's Last Will and Testament. Betty and Dustin contested the will, alleging Dennis lacked testamentary capacity, and asserted that the will and the power of attorney were executed as a result of Maggie's undue influence. The jury found in Betty and Dustin's favor.

### UNDUE INFLUENCE

The jury found that Dennis executed the durable statutory power of attorney and his will as a result of Maggie's undue influence and that he lacked capacity to execute the power of attorney and the will. The trial court's judgment concludes that the will and power of attorney are invalid due to Dennis's lack of competence. The judgment makes no mention of undue influence and reflects no conclusion based on undue influence. In issues eight through eleven, Maggie argues that there is no evidence or, alternatively, insufficient evidence to support the jury's finding of undue influence. Betty did not respond to these issues in her brief; instead she focused on the sufficiency of the evidence to support Dennis's lack of testamentary capacity. At oral argument, counsel for Betty agreed that the court did not incorporate the jury's undue influence finding into the judgment and stated that she was not relying on the jury's finding of undue influence to support the trial court's judgment. Based on Betty's concession that the trial

court's judgment is not supported by the jury's finding of undue influence, we need not address Maggie's issues regarding undue influence.

### ADMISSION OF DENNIS'S MEDICAL RECORDS

Betty introduced a number of Dennis's medical records to support her contention that Dennis lacked capacity to execute his will or durable power of attorney. Maggie argues that the trial court erroneously admitted Dennis's medical records into evidence. Betty and Dustin contend that the trial court properly admitted the documents because they were produced in response to discovery and were admitted under the rule of optional completeness.[1] Because Maggie's complaints pertaining to Dennis's medical records may affect the scope of our review as to the execution of Dennis's will and durable power of attorney, we first consider whether the trial court erred in admitting the medical records that Betty and Dustin rely on to support the jury's finding of lack of capacity.

Specifically, Betty and Dustin rely on the following medical records: (1) an August 27 record listing several of Dennis's medications; (2) a July 28 record indicating that Dennis denied being married; (3) an August 7 record stating that Dennis was "feeling hopeless" and that "his thinking [wa]s slightly illogical in that at times he report[ed] wanting to get better and get back to his life, while at other . . . times he sa[id] he wants to go home even if it means that he will die"; and (4) another August 7 record stating that Dennis's judgment was "severely impaired."[2]

### A. Standard of Review

We review a trial court's evidentiary ruling for an abuse of discretion. *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 906 (Tex. 2000). In determining whether the trial

---

[1] We note the record does not support the documents were proffered in the context of optional completeness.

[2] An August 6 medical record indicating that Dennis was suffering from "depression/adjustment disorder" is contained in the record as an exhibit, but the record reflects that this medical record was not admitted at trial.

court abused its discretion, we ask whether the trial court acted without reference to any guiding rules or principles, or whether the trial court's action was arbitrary or unreasonable. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

**B. Analysis**

The production of the medical records during discovery may have authenticated the medical records, but it did not render them admissible. *See* TEX. R. EVID. 901 (providing that the requirement of authentication is a necessary, rather than sufficient, condition for admissibility). Maggie argues that the medical records were not properly admitted because they were hearsay. In response, Betty argues the medical records were admissible as business records. A medical record is hearsay but may be admitted as a business record. *See* TEX. R. EVID. 801(d), 803(6). To be admitted as a business record, the medical record must be "made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the [records]." TEX. R. EVID. 803(6). All of these elements must be "shown by the testimony of the custodian or other qualified witness." *Id.*

The trial court admitted Dennis's August 27 medical record listing his medications during the testimony of Dennis's treating physician, Dr. Stanley, but Dr. Stanley did not lay the predicate for the introduction of the list as a business record. He did not testify that Dennis's list of medications was kept in the course of a regularly conducted business activity or that it was a regular practice to keep such medication lists. He was not the custodian of records and did not make the list. There was no evidence that the records were business records and admissible over Maggie's hearsay objection. Thus, the trial court abused its discretion in admitting this medical record. *See Downer*, 701 S.W.2d at 241–42.

Dennis's July 28 medical record noting that Dennis denied being married was admitted during an informal charge conference. Because no custodian of the record or otherwise qualified witness established the requirements of the business record exception, the trial court abused its discretion in admitting the July 28 medical record. *See id.*

Dennis's August 7 medical record stating that he was "feeling hopeless" and that "his thinking is slightly illogical" was admitted during the cross-examination of Maggie. Because Maggie was not the custodian of the record and not otherwise qualified to establish the requirements of the business record exception, the trial court abused its discretion in admitting that record. *See id.*

Dennis's other August 7 medical record indicating that his judgment was "severely impaired" was admitted during the direct examination of Dr. Stanley. However, because the evidence was admitted without objection, Maggie waived her complaint on appeal regarding this medical record. *See Faulkner v. Thrapp*, 616 S.W.2d 344, 347 (Tex. Civ. App.—Texarkana 1981, writ ref'd n.r.e.) ("[T]he trial court did not err in admitting this evidence because no objection was made to its being hearsay at the time of trial and this point was waived.").

## C. Conclusion

The trial court abused its discretion by admitting the medical records (1) detailing Dennis's medications, (2) stating that he denied being married, and (3) stating that his thinking was slightly illogical. Consequently, these medical records are not evidence that can support the jury's findings that Dennis lacked capacity to execute either his will or durable power of attorney. *See Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997) (explaining that evidence admitted in violation of the rules of evidence "is no[t] evidence of probative force to support a jury's finding"). But because Maggie waived her objection

regarding Dennis's August 7 medical record stating that his judgment was "severely impaired," the rules of evidence do not preclude our consideration of this medical record as we review the jury's finding of lack of testamentary capacity. *See id.* We next turn to the will to determine if the evidence supports the jury's finding of Dennis's lack of capacity to execute his will.

**THE WILL**

After Maggie applied to probate Dennis's will, Betty and Dustin argued that Dennis lacked testamentary capacity at the time he executed his will.[3] The jury agreed, finding that the will did not meet the requirements for a valid will. Maggie argues that the jury's finding was against the great weight and preponderance of the evidence and that the evidence conclusively established that the will met the legal requirements of a valid will as a matter of law. As the proponent of the will, Maggie had the burden of proof on the issue of Dennis's capacity to execute the will. *Seigler v. Seigler*, 391 S.W.2d 403, 404 (Tex. 1983).

**A. Standard of Review**

Under a legal sufficiency standard of review, we view the evidence in the light most favorable to the finding and indulge every reasonable inference that supports it. *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 822 (Tex. 2005). If, as in this case, the appellant attacks the legal sufficiency of an adverse finding on which she carried the burden of proof, she must demonstrate that the evidence conclusively establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam). In this "matter of law" challenge, we first review the record for evidence that supports the finding, while ignoring all evidence to the contrary unless a reasonable fact-finder could not. *City of Keller*, 168 S.W.3d at 827; *Dow Chem. Co.*, 46 S.W.3d at 241; *One Ford Mustang, VIN*

---

[3] Dustin and Betty did not challenge or controvert the evidence presented to establish that the will was properly executed but instead focused on Dennis's capacity to execute the will.

*1FAFP40471F207859 v. State*, 231 S.W.3d 445, 449 (Tex. App.—Waco 2007, no pet.). If there is no evidence to support the finding, then we examine the entire record to determine whether the contrary proposition is established as a matter of law. *Dow Chem. Co.*, 46 S.W.3d at 241. We will sustain a challenge to the jury's finding only if the appellant conclusively establishes the contrary proposition. *Id.*

## B. Testamentary Capacity

Testamentary capacity means that the testator has a sufficient mental ability, at the time of the execution of the will, to understand the business in which the testator is engaged, the effect of his act in making the will, and the general nature and extent of his property. *Lowery v. Saunders*, 666 S.W.2d 226, 232 (Tex. App.—San Antonio 1984, writ ref'd n.r.e.). Moreover, the testator must also know his next of kin and the natural objects of his bounty. *Id.*; *see also Lindley v. Lindley*, 384 S.W.2d 676, 679 (Tex. 1964). The issue is whether the testator has testamentary capacity on the day of the execution of the will, although evidence of the testator's prior or subsequent mental condition may be relevant if it suggests that the condition persisted and had some probability of being the same condition that existed on the date the will was executed. *See Lowery*, 666 S.W.2d at 232. Dennis executed his will on August 25, 2007. Thus, we turn to the evidence that supports his lack of capacity on that date. *See id.*

Betty and Dustin had little interaction with Dennis during August and admitted they had no personal knowledge of Dennis's condition the day the will was executed. Thus, they sought to prove through Dennis's medical records that Dennis lacked testamentary capacity. As previously discussed, the only medical record properly admitted into evidence that addresses Dennis's state of mind was the August 7 medical record stating that Dennis's judgment was severely impaired. This medical record described Dennis's mental condition in three words:

"judgment: severely impaired." This medical record was admitted into evidence without any explanation or elaboration by the physician who created it. This evidence of Dennis's prior mental condition is not probative because it does not suggest that Dennis's severely impaired judgment persisted after August 7 or that there was some probability that Dennis's severely impaired judgment existed on August 25. *See id.* Moreover, testimony of a witness to Dennis's signing of the will and friends who visited him in the hospital when he executed the will demonstrated that Dennis fully understood his actions in executing the will and was able to recognize and acknowledge his family members. *See City of Keller*, 168 S.W.3d at 827 (instructing that an appellate court must ignore evidence contrary to a jury's finding unless a reasonable fact-finder could not ignore that evidence). Even viewed in the light most favorable to the jury's finding that Dennis lacked testamentary capacity, we cannot reasonably infer from Dennis's severely impaired judgment on August 7, that on August 25, Dennis did not understand his actions, the effect of his act in making the will, or the general nature and extent of his property. *See Lowery*, 666 S.W.2d at 232. Finding no evidence to support the jury's finding that Dennis lacked testamentary capacity, we turn to Maggie's evidence to determine whether the contrary proposition is established.

Willy Majors, Dennis's close friend, testified that Dennis said he wanted to leave all of his property to his sister, Maggie, and that Dennis no longer considered Betty and Dustin his "family." Maggie also testified that Dennis said he wanted her to draft the will, and that he approved the will she had drafted for him. Dennis signed his will in the presence of two witnesses, Sarah Griewahn, a distant cousin, and Dr. Stanley. Sarah Griewahn testified that Maggie and Dr. Stanley read aloud to Dennis his will, which left all of Dennis's worldly possessions to Maggie. She further testified that Dennis was able to recognize his friends and his

family who had visited him. She also testified that in her fifty years as a nurse, she believed that Dennis had an understanding of what he was doing when he signed his will. Because the undisputed evidence establishes Dennis had testamentary capacity, we sustain Maggie's issue regarding the jury's finding that Dennis lacked testamentary capacity. *See id.*; *see also Dow Chem. Co.*, 46 S.W.3d at 241.

## D. Conclusion

Because no properly admitted evidence supported the jury's finding of incapacity and because the record establishes that Dennis understood the nature and character of his property and intended to leave all of his property to Maggie and nothing to Betty and Dustin, we sustain Maggie's issue regarding the lack of Dennis's testamentary capacity.

### POWER OF ATTORNEY

The jury found that Dennis's durable power of attorney, executed August 3, 2007, was not valid because he lacked mental capacity. Maggie argues that the evidence conclusively established both that the durable power of attorney was valid and that Dennis was competent.

## A. Requirements of a Durable Power of Attorney

Section 482 of the Texas Probate Code (the Durable Power of Attorney Act) provides that a "durable power of attorney" means a written instrument that:

(1) designates another person as attorney in fact or agent;
(2) is signed by an adult principal;
(3) contains the words "This power of attorney is not affected by subsequent disability or incapacity of the principal," or "This power of attorney becomes effective on the disability or incapacity of the principal," or similar words showing the principal's intent that the authority conferred on the attorney in fact or agent shall be exercised notwithstanding the principal's subsequent disability or incapacity; and

> (4) is acknowledged by the principal before an officer authorized to take acknowledgments to deeds of conveyance and to administer oaths under the laws of this state or any other state.

TEX. PROB. CODE ANN. § 482 (West 2003).

No evidence in the record indicates that the durable power of attorney lacked the legal requirements. The durable power of attorney that Dennis executed on August 3, 2007, reads, "I, Dennis Vackar, appoint Maggie Marbry as my agent (attorney-in-fact) to act for me . . . ." The document contained the words: "This power of attorney is not affected by my subsequent disability or incapacity." A notary public, Diana Cantu, testified that Dennis signed the Durable Power of Attorney in her presence by placing his thumbprint on the document, and that she thereafter signed the document. The evidence therefore conclusively establishes that Dennis's durable power of attorney met the legal requirements.

## B. Mental Capacity

A person seeking to set aside a power of attorney based on the executor's lack of mental capacity must show that the executor did not understand the nature or consequences of his act at the moment the power of attorney was executed. *See Tomlinson v. Jones*, 677 S.W.2d 490, 492–93 (Tex. 1984); *Mandell & Wright v. Thomas*, 441 S.W.2d 841, 845 (Tex. 1969). Mental capacity may be shown by circumstantial evidence of: (1) a person's outward conduct that manifests an inward condition; (2) pre-existing external circumstances tending to produce a special mental condition; and (3) a prior or subsequent mental condition. *Bach v. Hudson*, 596 S.W.2d 673, 676 (Tex. Civ. App.—Corpus Christi 1980, no writ). The issue of whether a person has mental capacity is ordinarily a question of fact for the jury to decide. *In re Estate of Robinson*, 140 S.W.3d 782, 793 (Tex. App.—Corpus Christi 2004, pet. denied).

As evidence of Dennis's mental incapacity, Betty and Dustin relied on his medical records and their own testimony at trial. The only medical record of Dennis's mental state was the August 7 record indicating that his judgment was severely impaired. For the reasons previously discussed, this medical record does not indicate that Dennis did not understand on August 3, 2007, he was giving Maggie the authority to act as his agent. Moreover, neither Betty nor Dustin were present the day Dennis signed his durable power of attorney. Betty conceded during cross-examination that she had no idea what Dennis's mental state was when he executed the durable power of attorney. Betty and Dustin presented no evidence to support the jury's finding that Dennis lacked mental capacity to execute his Power of Attorney. *See Tomlinson*, 677 S.W.2d at 492–93; *Mandell & Wright*, 441 S.W.2d at 845. Rather, the evidence shows that Dennis understood that he was giving Maggie the authority to act as his agent. Diana Cantu, the notary who acknowledged Dennis's Power of Attorney, testified that Dennis nodded to confirm he was able to understand what was going on prior to his signing the Power of Attorney on August 3, 2007. Cantu testified that she had confirmed with a social worker that the doctor and staff had determined that Dennis was competent to execute the Power of Attorney. Maggie testified that Dennis said he wanted her to be his agent and take care of his financial affairs. Andrew Vackar, Dennis's brother, also testified that Dennis wanted Maggie to be his agent.

We, therefore, sustain Maggie's issue regarding Dennis's mental capacity in executing his Power of Attorney.

### FAIRNESS OF THE GIFT

The jury found that Maggie's receipt of $100,000.00 in proceeds from Dennis's John Alden life insurance policy was an unfair gift to Maggie from Dennis's and Betty's community estate. Maggie challenges the sufficiency of the evidence supporting this finding.

Proceeds from a life insurance policy acquired as a benefit of employment during marriage are community property. *Korzekwa v. Prudential Ins. Co. of Am.*, 669 S.W.2d 775, 777 (Tex. App.—San Antonio 1984, writ dism'd). "The policy is the sole management community property of the employee spouse, and that spouse may designate the beneficiary of the policy." *Madrigal v. Madrigal*, 115 S.W.3d 32, 34–35 (Tex. App.—San Antonio 2003, no pet.). "However, because a trust relationship exists between husband and wife regarding the community property controlled by each spouse, if the designation of a third-party beneficiary constitutes actual or constructive fraud on the community, proceeds may be awarded to the surviving spouse rather than the designated beneficiary." *Id.*

A surviving spouse establishes a prima facie case of constructive fraud on the community with proof that the life insurance policy was purchased with community funds for the benefit of a person outside the community. *Murphy v. Metro. Life Ins. Co.*, 498 S.W.2d 278, 282 (Tex. Civ. App.—Houston [14th Dist.] 1973, writ ref'd n.r.e.). A donor or designated beneficiary seeking to overcome a prima facie case of fraud must prove that "the disposition of the surviving spouse's one-half community interest is fair." *See Madrigal*, 115 S.W.3d at 34–35. To determine whether a gift of proceeds is fair, a fact-finder considers: (1) the size of the gift in relation to the total size of the community estate; (2) the adequacy of the estate remaining to support the surviving spouse in spite of the gift; (3) the relationship of the donor to the donee; and (4) whether special circumstances existed to justify the gift. *Barnett v. Barnett*, 67 S.W.3d 107, 126 (Tex. 2001); *Madrigal*, 115 S.W.3d at 34–35. Whether a gift of life insurance proceeds is fair is generally a question of fact to be determined by the fact-finder. *Moore v. Tex. Bank & Trust Co.*, 576 S.W.2d 691, 695 (Tex. Civ. App.—Eastland 1979), *rev'd on other grounds*, 595

S.W.2d 502 (Tex. 1980); *see, e.g.*, *Goldstein v. Comm'n for Lawyer Disc.*, 109 S.W.3d 810, 818 (Tex. App.—Dallas 2003, pet. denied); *Murphy*, 498 S.W.2d at 282.

Maggie argues that a gift of life insurance proceeds is fair as a matter of law if the surviving spouse receives more than half of the community estate.[4] However, all of the cases Maggie relies upon affirmed findings that a gift was fair because the evidence presented at trial supported these findings. None holds that a gift from a community estate is fair to the donor's spouse as a matter of law if a spouse receives equal to or more than one half of the total community estate. *See Street*, 887 S.W.2d at 82; *Tabassi*, 737 S.W.2d at 616; *Horlock*, 533 S.W.2d at 55.

In *Murphy v. Metropolitan Life Insurance Co.*, the court held that the fact that a surviving spouse receives more than half of the community estate does not determine the fairness of a gift. 498 S.W.2d 278, 282 (Tex. Civ. App.—Houston [14th Dist.] 1973, writ ref'd n.r.e.). In *Murphy*, the decedent gave $12,500.00 in life insurance proceeds to his mother. *Id.* at 280. The trial court found that the gift constituted fraud on the community because it was not fair to the decedent's surviving spouse. *Id.* The Houston Court of Appeals affirmed this finding, despite the wife's receipt of over half of the community estate, reasoning that the gift was relatively large (about one-sixth of the community), the remainder of the community estate did not leave the wife with much financial security, the wife had no separate property, and she had three sons to raise and educate. *Id.* at 282. Based on this evidence, the court held that the trial court did not abuse its discretion in finding that the gift was unfair. *Id.*

Here, because Maggie does not contest that Dennis's John Alden insurance policy was a part of the community estate, Maggie had the burden to prove that Dennis's gift was fair. *See*

---

[4] In support of this proposition, Maggie relies on *Street v. Skipper*, 887 S.W.2d 78, 79 (Tex. App.—Fort Worth 1994, writ denied), *Tabassi v. NBC Bank-San Antonio*, 737 S.W.2d 612, 616 (Tex. App.—Austin 1987, writ ref'd n.r.e.), and *Horlock v. Horlock*, 533 S.W.2d 52, 55 (Tex. Civ. App.—Houston [14th Dist.] 1975, writ dism'd w.o.j.).

*Madrigal*, 115 S.W.3d at 34–35. Maggie argues that the community estate is comprised of the following assets: a residence valued at $108,000.00; vehicles valued together at $21,500.00; an accidental death policy of $2,000.00; a Wells Fargo account with a balance of $20,000.00; the John Alden life insurance policy of $100,000.00; Betty's retirement of $18,000.00; Dennis's 401(k) of $11,000.00; and Dennis's pension, which Maggie calculates to be over $567,000.00. Maggie reaches the $567,000.00 figure by calculating Betty's life expectancy and multiplying the number of months by the monthly amount—around $2,000.00—Betty will receive from Dennis's pension. However, Maggie failed to introduce at trial any evidence of Betty's life expectancy. Because the jury did not consider the pension election in light of the estimated length of Betty's life expectancy, Maggie failed to demonstrate that this amount is definitive of the size of the community estate. Therefore, the evidence as to the size of the gift in relation to the total size of the community estate or as to the adequacy of the estate remaining to support Betty was insufficient. Thus Maggie failed to meet her burden to show that the gift was fair as a matter of law. *See id.*; *see also Moore*, 576 S.W.2d at 695.

Moreover, even if Maggie had introduced evidence of Betty's life expectancy and the present value of the predicted total Betty would receive in monthly payments for Dennis's retirement, other evidence supports the jury's finding that the gift was unfair. Assuming that Betty would receive over $567,000.00 from Dennis's retirement, the John Alden proceeds comprise almost one-eighth of the community estate. Betty testified that she was disabled, that she was a bus driver paid on an hourly basis, and that Dennis's pension comprised almost half of her monthly income. Although Maggie was Dennis's sister and Dennis was estranged from Betty, the evidence also showed that Maggie had already received life insurance proceeds in

excess of $300,000.00 from Dennis's other life insurance policy. Based on the foregoing, the evidence supported the jury's finding that the gift was unfair. *See Murphy*, 498 S.W.2d at 282.

## CONCLUSION

Therefore, we reverse and render judgment that Dennis's will and power of attorney were validly executed, but we affirm the judgment as far as it invalidates the gift of the John Alden life insurance policy.

Rebecca Simmons, Justice