**ESTATE OF William H. MATTHEWS III, Deceased**

**No. 04-15-00461-CV**

Court of Appeals of Texas,
San Antonio.

Delivered and Filed: August 31, 2016

Darby Riley, Charles Riley, Riley & Riley, San Antonio, TX, for Appellant

Gordon Wayne Slade Jr., The Slade Law Firm, Raymond K. Leach, Law Offices of Ray Leach, San Antonio, TX, for Appellee

Sitting: Karen Angelini, Justice, Rebeca C. Martinez, Justice, Patricia O. Alvarez, Justice

## OPINION

Opinion by: Patricia O. Alvarez, Justice

This appeal arises from the trial court's judgment voiding a marriage between a former in-home health aide and a patient she cared for—a disabled veteran with physical and mental health issues who committed suicide ten weeks after they married. The putative widow argues, inter alia, (1) the trial court lacked jurisdiction because the executor had no standing and there was no live controversy, and (2) the evidence was neither legally nor factually sufficient for the trial court to set aside a Rule 11 settlement agreement or for the jury to find the veteran lacked capacity to consent to marriage.

We conclude the evidence was sufficient for the trial court to set aside the Rule 11 agreement, the executor's capacity challenge was waived, there was a live controversy to decide, and the evidence was sufficient to support the jury's finding that the disabled veteran lacked the mental capacity to consent to marriage. Therefore, we affirm the trial court's judgment.

### BACKGROUND

In the underlying suit, William H. Matthews Jr. petitioned the trial court to annul his deceased son's marriage to Katherine Sanchez Matthews, and he sued Katherine for civil claims. We briefly review the relevant facts.

### A. Billy's History, Marriage to Katherine

William Henry Matthews III (Billy), an Army veteran of Operation Iraqi Freedom, was medically discharged as 100% disabled

after he developed multiple sclerosis. Along with MS, he was treated for depression, Attention Deficit Hyperactivity Disorder, and Post-Traumatic Stress Disorder. He also had an ongoing history of marijuana and alcohol abuse.

Katherine Sanchez Matthews met Billy in 2007 when she served as his home health aide. According to Katherine, they developed a romantic relationship and Billy proposed to her in 2008. It is undisputed that they married on June 1, 2010.

On August 8, 2010, Billy died of a self-inflicted gunshot wound.

## B. Katherine's Claim, William's Petition

Billy's will devised all his property to his father, William H. Matthews Jr. (William), and named his father as executor of his estate. After Billy's death, William applied to probate Billy's will. Later, and allegedly not knowing Billy had a will, Katherine filed an application to determine heirship, and she claimed an interest in Billy's real property. William then petitioned the court to annul Billy's marriage to Katherine. He alleged Billy lacked the capacity to enter into a marriage and Katherine exercised undue influence over Billy to consent to the marriage. William's second amended petition also sought a determination of Katherine's homestead rights in Billy's house, a determination that Katherine had breached her fiduciary duty to Billy's estate and converted certain funds, and attorney's fees.

## C. Rule 11 Settlement Agreement

Initially, William and Katherine reached a Rule 11 agreement to settle their dispute. The agreement required Katherine to return a number of Billy's items to William and to reimburse Billy's estate for $3,000. Additionally, Katherine was to "waive and surrender all claims against [Billy's estate], including all claims derived by virtue of [her] marriage to [Billy], any claims of reimbursement, and homesteads rights in the Estate's real property and any claims for spousal allowance of any kind as of [the date of the agreement]." In return, William was to "dismiss with prejudice or agree to a take nothing judgment ... for any and all claims challenging [Katherine]'s marriage to [Billy] as well as any claims by the estate against [Katherine]."

## D. Settlement Agreement Set Aside, Jury Trial

A few months after the Rule 11 agreement was signed, William learned Katherine had not returned some items of Billy's personal property that were listed in the settlement agreement. Additionally, a neighbor told William she saw some of Billy's property in the garage of Durgal Jamon Pipes, Katherine's ex-boyfriend. William moved to have the Rule 11 agreement set aside on the basis of misrepresentation and fraud. He also asked the court to reinstate all the claims in his second amended petition, including his application to annul Billy and Katherine's marriage.

After a hearing, the trial court set aside the agreement. The claims in William's petition were reinstated, and the case proceeded to trial. A jury found that Billy did not have the mental capacity to consent to marriage and Katherine exercised undue influence on Billy to consent to the marriage. The trial court annulled the marriage and declared it void. William filed a motion to modify the judgment to include an award of attorney's fees, but after a hearing, the trial court denied the motion. Katherine appeals the trial court's judgment.

## E. Katherine Appeals

On appeal, Katherine raises five issues. She argues (1) the trial court lacked sub-

ject matter jurisdiction because William was not an interested person in a suit to void a decedent's marriage and there was no live controversy; and the evidence is neither legally nor factually sufficient to support (2) the trial court setting aside a Rule 11 agreement or (3) the jury finding of lack of capacity to consent to marriage.

She also argues (4) undue influence is not a valid basis for a post-mortem annulment under the Texas Estates Code and (5) the evidence is neither legally nor factually sufficient to support the jury's finding of undue influence.

### Rule 11 Settlement Agreement

■ Because Katherine's challenge to the trial court's subject matter jurisdiction requires us to determine whether the trial court could set aside the Rule 11 agreement, we address the Rule 11 agreement first. Katherine argues the trial court erred in setting aside the Rule 11 agreement because the evidence was neither legally nor factually sufficient to support its decision. We briefly recite the standard of review and applicable law.

### A. Standard of Review

■ "When a party seeks to set aside a settlement agreement, a reviewing court generally reviews the trial court's decision . . . for an abuse of discretion." *Arizola v. Tutle & Tutle Trucking, Inc.*, No. 04–11–00067–CV, 2012 WL 2335995, at *2 (Tex. App.–San Antonio June 20, 2012, pet. denied) (mem. op.); *accord Davis v. Davis*, No. 01–12–00701–CV, 2014 WL 890899, at *4 (Tex.App.–Houston [1st Dist.] Mar. 6, 2014, no pet.) (mem. op.); *In re C.H., Jr.*, 298 S.W.3d 800, 804 (Tex.App.–Dallas 2009, no pet.). "Where a party challenges the sufficiency of the evidence to support a discretionary decision, courts often employ a two-pronged analysis: '(1) Did the trial court have sufficient information upon which to exercise its discretion; and (2) Did the trial court err in its application of discretion?' " W. Wendell Hall et al., *Hall's Standards of Review in Texas*, 42 St. Mary's L.J. 3, 18 (2010) (quoting *Lindsey v. Lindsey*, 965 S.W.2d 589, 592 (Tex.App.–El Paso 1998, no pet.)); *see Ford Motor Co. v. Garcia*, 363 S.W.3d 573, 578 (Tex.2012) ("A trial court abuses its discretion by ruling (1) arbitrarily, unreasonably, or without regard to guiding legal principles; or (2) without supporting evidence.").

### B. Applicable Law

■ "If the parties reach a settlement agreement and execute a written agreement disposing of the dispute, the agreement is enforceable in the same manner as any other written contract." Tex. Civ. Prac. & Rem. Code Ann. § 154.071(a) (West 2011); *accord Garza v. Villarreal*, 345 S.W.3d 473, 479 (Tex.App.–San Antonio 2011, pet. denied) ("A settlement agreement is a contract, and its construction is governed by legal principles applicable to contracts generally." (quoting *Donzis v. McLaughlin*, 981 S.W.2d 58, 61 (Tex.App.–San Antonio 1998, no pet.)). A settlement agreement may be rescinded based on fraudulent misrepresentations made to induce the other party to enter into the agreement. *See Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 178 (Tex.1997). "Promises made without intention of fulfillment, in order to induce others to make contracts, are as culpable and as harmful as are willful misrepresentations of existing facts. Hence contracts may be avoided alike for such fraudulent promises and for such misrepresentations." *Id.* (quoting *Edward Thompson Co. v. Sawyers*, 111 Tex. 374, 234 S.W. 873, 874 (1921)). "Since intent to defraud is not susceptible to direct proof, it invariably must be proven by circumstantial evidence." *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex.

1986). "While breach of the contract alone is not evidence that a party did not intend to perform, 'breach combined with "slight circumstantial evidence" of fraud' is some evidence of fraudulent intent, enough to support a verdict." *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 775 (Tex.2009) (quoting *Spoljaric*, 708 S.W.2d at 435).

## C. Analysis

At the hearing on the motion to set aside the Rule 11 agreement, William and Katherine both testified.

### 1. William's Testimony

William testified to the following facts. Shortly after Billy's death, Katherine changed the door locks on Billy's house and William no longer had access to it. William relied on Katherine's representations as the basis for him to agree to the settlement. He relied on her promises that she would return Billy's property and restore William's access to Billy's house. When a neighbor later told William she saw some of Billy's property in Pipes's garage, William obtained a writ of sequestration. In executing the writ, the searchers discovered boxes of Billy's property in Pipes's garage. Katherine previously told William she did not have some of the discovered items or she did not know where they were. William reiterated that he relied on Katherine's representations when he agreed to the settlement.

### 2. Katherine's Testimony

Katherine testified she made no misrepresentations to William and she fully intended to comply with the settlement agreement. She insisted she returned virtually all of Billy's property to William. But she admitted she did not turn over some of the items covered by the agreement and she had a prior romantic relationship with Pipes.

### 3. Trial Court's Role, Discretion

At the hearing to set aside the Rule 11 agreement, the trial court was the factfinder; it could weigh the evidence and resolve conflicts in the evidence. *See City of Keller v. Wilson*, 168 S.W.3d 802, 819–20 (Tex.2005). The trial court could have believed William's testimony that he relied on Katherine's promises—to return Billy's property—to enter into the settlement agreement. *See id.* The trial court could have found that the boxes of Billy's property in Pipes's garage were circumstantial evidence of Katherine's intent—at the time she entered into the Rule 11 agreement—to not fulfill her promises. *See Aquaplex*, 297 S.W.3d at 775; *Spoljaric*, 708 S.W.2d at 435. Moreover, the trial court could have disbelieved Katherine's testimony that she made no misrepresentations to William and she intended to comply with the agreement. *See City of Keller*, 168 S.W.3d at 819–20.

### 4. No Abuse of Discretion

We conclude the trial court had sufficient information to find that Katherine intentionally made deceptive and fraudulent promises to William to induce him to enter into the agreement, and her misrepresentations were grounds to overturn the Rule 11 agreement. *See Schlumberger Tech. Corp.*, 959 S.W.2d at 178 (quoting *Edward Thompson Co.*, 234 S.W. at 874). The trial court's decision was not arbitrary, unreasonable, or without regard to guiding legal principles, and it acted within its discretion when it vacated its order accepting the Rule 11 settlement agreement and set aside the agreement. *See Ford Motor Co.*, 363 S.W.3d at 578; Hall, 42 St. Mary's L.J., at 18.

We turn now to what effect the trial court's decision setting aside the Rule 11 agreement had on its subject matter jurisdiction.

SUBJECT MATTER JURISDICTION

Katherine argues William lacked standing to bring a suit to annul her marriage to Billy because William was not an "interested person." *See* TEX. EST. CODE ANN. § 123.102 (West 2014) ("Application to Void Marriage After Death"). Katherine also argues the trial court lacked subject matter jurisdiction to hear the case because the settlement agreement disposed of all the parties' claims and there was no remaining live controversy.

In response, William argues that because the settlement agreement was set aside, there was a live controversy at the time of trial, his suit to annul the marriage actually disposed of Katherine's claims against the estate, and the trial court had subject matter jurisdiction.

## A. Standard of Review

■ "Subject matter jurisdiction is an issue that may be raised for the first time on appeal; it may not be waived by the parties." *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 445 (Tex. 1993); *accord Caroll v. Caroll*, 304 S.W.3d 366, 367 (Tex.2010). We review a challenge to a trial court's subject matter jurisdiction de novo. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex.2004); *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 502 (Tex.2010).

## B. Jurisdictional Challenges

■ "Subject matter jurisdiction requires that the party bringing the suit have standing, that there be a live controversy between the parties, and that the

case be justiciable." *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 865 (Tex.2010) (quoting *State Bar of Tex. v. Gomez*, 891 S.W.2d 243, 245 (Tex.1994)).

### 1. Standing

■ Texas standing doctrine[1] requires (1) "a real controversy between the parties," that (2) "will be actually determined by the judicial declaration sought." *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 848 (Tex.2005) (citing *Nootsie Ltd. v. Williamson Cty. Appraisal Dist.*, 925 S.W.2d 659, 661 (Tex.1996)). "[T]he issue of standing may be raised for the first time on appeal." *Lovato*, 171 S.W.3d at 849 (citing *Tex. Ass'n of Bus.*, 852 S.W.2d at 445); *accord Nootsie*, 925 S.W.2d at 662.

### 2. Capacity

■ "In addition to standing, a plaintiff must have the capacity to pursue a claim." *Lovato*, 171 S.W.3d at 849; *accord John C. Flood of DC, Inc. v. SuperMedia, L.L.C.*, 408 S.W.3d 645, 650 (Tex.App.–Dallas 2013, pet. denied). "[C]apacity means a party's right to come into court to pursue [its] claim." Dorsaneo, 28 REV. LITIG. at 65 (citing *Lovato*, 171 S.W.3d at 848–49) (addressing both common law and statutory rights to sue). "Unlike standing, an argument that an opposing party does not have the capacity to participate in a suit can be waived." *Nootsie*, 925 S.W.2d at 662; *see* TEX. R. CIV. P. 93(1) (requiring a verified pleading to challenge the capacity to sue); *Lovato*, 171 S.W.3d at 849 (citing Rule 93 and recognizing that a challenge to capacity may be waived by failure to file a

---

1. Applying Texas standing doctrine—especially in its relationship to capacity—can be challenging. *See, e.g., Coastal Oil & Gas Corp. v. Garza Energy Trust*, 268 S.W.3d 1, 9 n. 16 (Tex.2008) ("This Court has not indicated whether standing is always a matter of subject-matter jurisdiction."); William V. Dorsaneo III, *The Enigma of Standing Doctrine in Texas Courts*, 28 REV. LITIG. 35, 37 (2008) ("The elevation of standing to a jurisdictional doctrine requires a clear line of demarcation between the doctrines of capacity and standing. No such line has been established ....").

verified pleading); *Pledger v. Schoellkopf*, 762 S.W.2d 145, 146 (Tex.1988) (per curiam) (same).

### 3. Questions at Issue

In Texas case law, the relationship between standing and capacity is hardly clear. *Lovato*, 171 S.W.3d at 848 & n. 1, and the parties disagree on whether Katherine's complaints stem from standing or capacity. Nevertheless, we address the questions Katherine presents: (1) whether William was an interested person who could bring a suit to annul her marriage and (2) whether there were any live claims at the time of trial. We first address the interested person question.

## C. Interested Person Challenge

■ In her motion for judgment notwithstanding the verdict, Katherine challenged William's standing. She argued that because William sued only in his capacity as executor, he lacked standing because an executor is not an interested person.

### 1. Interested Person Status

Only an "interested person" may apply to void a decedent's marriage. *See* Tex. Est. Code Ann. § 123.102 (West 2014). The Estates Code defines an "interested person" as "(1) an heir, devisee, spouse, creditor, or any other having a property right in or claim against an estate being administered; and (2) anyone interested in the welfare of an incapacitated person, including a minor." *Id.* §§ 22.001, .018 (applying, with some exceptions not applicable here, Chapter 22's definitions to the Estates Code).

It is the plaintiff's burden to plead and prove his status as an interested person. *See id.* § 123.102 (requiring interested person status to bring a suit to annul a decedent's marriage); *Womble v. Atkins*, 160 Tex. 363, 331 S.W.2d 294, 297 (1960) (recognizing interested person status as a

threshold question); *In re Estate of Hill*, 761 S.W.2d 527, 528 (Tex.App.–Amarillo 1988, no writ) (same).

■ In a probate proceeding, the status question must be determined through an in limine proceeding. *See Hill*, 761 S.W.2d at 528–29 ("The preliminary in limine proceeding is to be conducted before, and its determination made by, the court without a jury."); *accord In re Estate of Armstrong*, 155 S.W.3d 448, 453 (Tex. App.–San Antonio 2004, no pet.) (quoting *Womble*). If one seeks to challenge the plaintiff's interested person status, "[t]he proper and required procedure is to try the issue of interest separately and in advance of a trial of the issues." *Estate of Hill*, 761 S.W.2d at 528 (citing *Chalmers v. Gumm*, 137 Tex. 467, 154 S.W.2d 640, 643 (1941)); *accord Womble*, 331 S.W.2d at 298; *In re Estate of Perez–Muzza*, 446 S.W.3d 415, 419 (Tex.App.–San Antonio 2014, pet. denied). If the would-be challenger fails to raise the issue before trial, the issue is waived. *Chalmers*, 154 S.W.2d at 643; *see Estate of Perez–Muzza*, 446 S.W.3d at 419; *Estate of Hill*, 761 S.W.2d at 528.

### 2. Capacity Challenge Waived

Relying on *Cunningham*, Katherine argues that William lacks standing to bring a suit to annul the marriage because he sued only in his capacity as executor. *See* Tex. Est. Code Ann. §§ 22.018, 123.102; *Cunningham v. Fox*, 879 S.W.2d 210, 212 (Tex. App.–Houston [14th Dist.] 1994, writ denied) ("An executor of an estate is *not* an interested person."). However, unlike the defendant in *Cunningham*, Katherine did not challenge William's status as an interested person by a pre-trial proceeding; rather, she raised this challenge for the first time in her motion for judgment notwithstanding the verdict. *Contra Womble*, 331 S.W.2d at 297–98 ("The proper procedure is to try the issue of interest separately and in advance of a trial of the

issues . . . ."); *Chalmers*, 154 S.W.2d at 642 ("[T]his exception [to interested person status] must be taken in limine, and could form no part of the inquiry after an issue had been made upon the merits." (quoting *Newton v. Newton*, 61 Tex. 511, 512 (1884)); *Estate of Hill*, 761 S.W.2d at 528. Further, Katherine failed to file a verified denial of William's capacity to bring the suit to annul her marriage. *Contra* Tex. R. Civ. P. 93; *Lovato*, 171 S.W.3d at 849; *Pledger*, 762 S.W.2d at 146 ("When capacity is contested, Rule 93(2) requires that a verified plea be filed anytime the record does not affirmatively d[e]monstrate the plaintiff's . . . right to bring suit . . . in *whatever* capacity he is suing.").

Because Katherine failed to properly challenge William's capacity as executor to bring a suit to annul the marriage, she waived her complaint. *See Lovato*, 171 S.W.3d at 849 (Rule 93); *Pledger*, 762 S.W.2d at 146 (same); *Womble*, 331 S.W.2d at 297–98 (in limine proceeding); *Chalmers*, 154 S.W.2d at 642 (same); *Estate of Perez–Muzza*, 446 S.W.3d at 419 (same); *Estate of Hill*, 761 S.W.2d at 528 (same).

**D. Live Controversy Challenge**

 Although Katherine waived her complaint against William's capacity, she may raise for the first time on appeal a challenge to William's standing. *See Lovato*, 171 S.W.3d at 849 (citing *Tex. Ass'n of Bus.*, 852 S.W.2d at 445); *Nootsie*, 925 S.W.2d at 662.

 Katherine argues William lacks standing because, at the time of trial, there was no remaining live controversy. A controversy is live if there is an unresolved dispute over which the trial court has jurisdiction and the parties have a legally cognizable interest in the outcome. *See Williams v. Lara*, 52 S.W.3d 171, 184 (Tex. 2001); *Camarena v. Tex. Emp't Comm'n*, 754 S.W.2d 149, 151 (Tex.1988) (remaining dispute on attorney's fees was a legally cognizable interest and a live controversy). A party has a legally cognizable interest when the court can grant relief on the party's claims. *See Lara*, 52 S.W.3d at 184; *Camarena*, 754 S.W.2d at 151; *see also Gomez*, 891 S.W.2d at 245 (reciting that subject matter jurisdiction requires standing, a live controversy, and a justiciable interest).

*1. Legally Cognizable Interest*

William's second amended petition asked for relief on a number of claims: (1) the annulment of Billy's marriage to Katherine because Billy lacked the mental capacity to enter into a marriage and Katherine exercised undue influence over him to consent to the marriage, (2) a determination that Katherine had no homestead rights in Billy's house, and (3) a determination that Katherine breached her fiduciary duty to Billy's estate and converted certain funds. The Rule 11 settlement agreement resolved these issues: Katherine waived her homestead rights to Billy's house and other property, and William waived his claims against Katherine regarding her marriage to Billy.

Katherine argues there was no live controversy because she "abandoned her homestead rights in Billy's house" and "there was no other property issue pending" at the time of trial.[2] However, when

---

2. Citing *Mendoza*, Katherine argues William's attorneys made " 'testimonial quasi-admissions' which should be treated as conclusive judicial admissions" that the estate had no justiciable interest at the time of trial. *See Mendoza v. Fid. & Guar. Ins. Underwriters, Inc.*, 606 S.W.2d 692, 694 (Tex.1980) (citing *Griffin v. Superior Ins. Co.*, 161 Tex. 195, 338 S.W.2d 415, 419 (1960)). We disagree with Katherine's analysis and conclusion.

At a post-trial hearing on a matter unrelated to the merits of the annulment suit, Wil-

the trial court vacated its previous order and set aside the agreement, the claims in William's second amended petition were again at issue. *See Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 361 (Tex.App.–Dallas 2009, pet. denied) (noting claims at issue are those in the "last-filed, live pleading in the record."). Specifically, William sought to extinguish Katherine's actual or potential claims against the estate on the basis of her being Billy's spouse. Further, both sides still had live claims for their attorney's fees. *See Camarena*, 754 S.W.2d at 151. Moreover, William's petition to annul the marriage, and the question of Billy's capacity to marry Katherine, remained open questions of fact. *See In re Estates of Gomez*, No. 04–05–00300–CV, 2005 WL 3115871, at *8 (Tex.App.–San Antonio Nov. 23, 2005, no pet.) (mem. op.); *accord In re Estate of Vackar*, 345 S.W.3d 588, 597 (Tex.App.–San Antonio 2011, no pet.) ("The issue of whether a person has mental capacity is ordinarily a question of fact for the jury to decide.").

The issue of mental capacity is a legally cognizable interest because an applicant may seek relief on this issue through the court's declaration that the marriage is void. *See* Tex. Est. Code Ann. § 123.103; *Lara*, 52 S.W.3d at 184. At the time of

trial, the trial court had unresolved disputes before it and had jurisdiction to declare the marriage void and deny all other relief. *Cf. Lara*, 52 S.W.3d at 184 (no relief possible).

Because, inter alia, the trial court was able to grant or deny relief on the unresolved claims before it, we conclude there was still a live controversy. *See id.*

### 2. Binding Decision

To be a live controversy, the trial court's decision must be able to bind the parties. *See Gomez*, 891 S.W.2d at 245; *cf. Tex. Ass'n of Bus.*, 852 S.W.2d at 444 ("The distinctive feature of an advisory opinion is that it decides an abstract question of law without binding the parties."). Katherine does not argue that she did not answer or would not otherwise be bound by the trial court's decision. It is undisputed that Katherine answered William's petition and she actively participated in the proceedings up to and including the trial. We conclude both parties were bound by the trial court's decision. *See Gomez*, 891 S.W.2d at 245.

### E. Trial Court Retained Subject Matter Jurisdiction

Having reviewed the record and the applicable law, we conclude William's status

---

liam's trial counsel briefly opined that, at the time of trial, Katherine had abandoned her homestead rights in Billy's house and there were no other property issues pending. Katherine argues this post-trial testimony should be treated as a judicial admission that the estate had no remaining justiciable interests at the time of trial. *See id.*

But at the same hearing, William's trial counsel also testified there were "potential issues in this case involving surviving spouse's claims" and "those would have depended on the outcome of the annulment trial." Given this inconsistent testimony, and assuming arguendo that William's attorneys' post-trial statements could negate the live pleadings at the time of trial, we conclude William's counsel's statements were not "deliberate, clear,

and unequivocal," and they did not meet *Mendoza's* test for judicial admissions. *Contra id.*

Further, the parties have not cited, and we have not discovered in the record, any Rule 11 agreement, nonsuit, or the like that was filed *after* the trial court set aside the settlement agreement and which disposed of the claims in William's second amended petition. Thus, after the trial court vacated its order and set aside the settlement agreement, William's claims in his second amended petition—his live pleading—were at issue. Those issues remained before the court until the trial court's judgment disposed of them. *See id. See generally Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 195 (Tex.2001) (final judgments).

as executor was an issue of capacity, not standing; because Katherine failed to challenge his status by an in limine proceeding, she waived her complaint. *See Womble*, 331 S.W.2d at 297–98; *Chalmers*, 154 S.W.2d at 642; *Estate of Perez–Muzza*, 446 S.W.3d at 419; *Estate of Hill*, 761 S.W.2d at 528. Further, at the time of trial, because the parties (1) had a legally cognizable interest in the outcome of the case and (2) were bound by the decision of the court, there was a live controversy to decide. *See Lara*, 52 S.W.3d at 184; *Gomez*, 891 S.W.2d at 245. We conclude the trial court had subject matter jurisdiction over William's claims. *See Travelers*, 315 S.W.3d at 865; *Gomez*, 891 S.W.2d at 245.

## MENTAL CAPACITY

In challenging the trial court's judgment voiding her marriage to Billy, Katherine argues the jury's finding that Billy lacked the mental capacity to consent to marriage was not supported by evidence that was either legally or factually sufficient.

## A. Standards of Review

### 1. Legal Sufficiency

"When a party attacks the legal sufficiency of an adverse finding on an issue on which it did not have the burden of proof, it must demonstrate on appeal that no evidence supports the adverse finding." *Graham Cent. Station, Inc. v. Pena*, 442 S.W.3d 261, 263 (Tex.2014) (per curiam) (citing *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex.1983)). We review the evidence in the light most favorable to the verdict, "credit[ing] favorable evidence if reasonable jurors could, and disregard[ing] contrary evidence unless reasonable juror could not." *City of Keller*, 168 S.W.3d at 822, 827; *accord Graham Cent. Station*, 442 S.W.3d at 263. But "[j]urors are the sole judges of the credibility of the wit-

nesses and the weight to give their testimony," and "[i]t is the province of the jury to resolve conflicts in the evidence." *City of Keller*, 168 S.W.3d at 819–20. "If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so," and we may not substitute our judgment for that of the jury's. *Id.* at 822.

### 2. Factual Sufficiency

When a party attacks the factual sufficiency of the evidence pertaining to a finding on which the party did not have the burden of proof, the party must "demonstrate there is insufficient evidence to support the adverse finding." *Flying J Inc. v. Meda, Inc.*, 373 S.W.3d 680, 690–91 (Tex.App.–San Antonio 2012, no pet.) (citing *Croucher*, 660 S.W.2d at 58). We consider all the evidence, but we will not reverse the judgment unless " 'the evidence which supports the jury's finding is so weak as to [make the finding] clearly wrong and manifestly unjust.' " *Id.* (quoting *Star Enter. v. Marze*, 61 S.W.3d 449, 462 (Tex.App.–San Antonio 2001, pet. denied)); *see Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986).

## B. Applicable Law

William petitioned the trial court to annul Billy's marriage to Katherine under provisions in the Estates Code. Section 123.102 creates a right to petition to annul a decedent's marriage.

(a) Subject to Subsection (c), if a proceeding described by Section 123.101(a) is not pending on the date of a decedent's death, an interested person may file an application with the court requesting that the court void the marriage of the decedent if: (1) on the date of the decedent's death, the decedent was married; and (2) that marriage com-

menced not earlier than three years before the date of the decedent's death.

TEX. EST. CODE ANN. § 123.102. Section 123.103 states the elements required to void a decedent's marriage.

> [I]n a proceeding brought under [Estates Code] Section 123.102, the court shall declare the decedent's marriage void if the court finds that, on the date the marriage occurred, the decedent did not have the mental capacity to: (1) consent to the marriage; and (2) understand the nature of the marriage ceremony, if a ceremony occurred.

*Id.* § 123.103. If a party seeks to annul a decedent's marriage for lack of mental capacity, the burden is on the applicant to prove the decedent lacked the required mental capacity. *See Tex. Emp'r Ins. Ass'n v. Elder*, 155 Tex. 27, 282 S.W.2d 371, 374 (1955); *Estates of Gomez*, 2005 WL 3115871, at *8; *Christoph v. Sims*, 234 S.W.2d 901, 904 (Tex.Civ.App.–Dallas 1950, writ ref'd n.r.e.) ("[I]f [a pleader] alleges that ... a marriage was void or voidable, the burden is likewise upon [the pleader] to prove it.").

The applicant may show lack of the required mental capacity in a number of ways:

> A lack of mental capacity may be shown by circumstantial evidence which includes: (1) the person's outward conduct, "manifesting an inward and causing condition;" (2) any pre-existing external circumstances tending to produce a special mental condition; and (3) the prior or subsequent existence of a mental condition from which a person's mental capacity (or incapacity) at the time in question may be inferred.

*Estates of Gomez*, 2005 WL 3115871, at *8; *accord Estate of Vackar*, 345 S.W.3d at 597.

The question of mental capacity to consent to marriage is generally "a question of fact for the jury to decide." *Estate of Vackar*, 345 S.W.3d at 597; *accord Estates of Gomez*, 2005 WL 3115871, at *8. The responsibility to weigh evidence and assess credibility rests with the jury. *See Villarreal v. Guerra*, 446 S.W.3d 404, 411 (Tex.App.–San Antonio 2014, pet. denied); *Ruiz v. Guerra*, 293 S.W.3d 706, 718 (Tex.App.–San Antonio 2009, no pet.).

## C. Analysis

The jury was charged with determining whether Billy lacked the mental capacity to consent to marriage and understand the nature of the marriage ceremony. The charge corresponded to the statute's language where it stated that a person "lacks mental capacity at the time of the marriage if he is unable to appreciate the effect of what he is doing and understand the nature and consequences of his acts and the marriage he was transacting." *See* TEX. EST. CODE ANN. § 123.103.

### 1. Evidence of Capacity

Katherine argues Billy had the mental capacity to consent to marriage and that he understood the nature of the marriage ceremony. She points to medical records and other evidence that she argues establishes Billy's mental capacity. The records include comments by multiple health care providers describing Billy's mental status as "average," "stable," "normal," "fair," and "good." Katherine also points to an excerpt from Michael W. Myers, M.D.'s progress notes from April 5, 2010, that read as follows:

> Sensorium, Memory: Alert and oriented to name, date, location, and situation. Recent, remote memory: intact by conversation. Attention, concentration: fair. Intelligence, Judgment, Insight: Intellectual functioning is average base on speech, vocabulary, and general fund of

knowledge. Judgment: fair. Insight: good.

Thought Processes: Coherent, logical and goal-directed without flights of ideas, loose associations, or thought blocking. Patient voices no current homicidal and suicidal ideation and auditory and visual hallucinations; no evidence of delusional thinking.

Katherine also testified that she and Billy spent about thirty minutes speaking with the judge just before they were married. In closing arguments, Katherine's counsel argued the judge did not refuse to perform the marriage for the lack of Billy's capacity.

*2. Evidence of Incapacity*

The jury heard testimony on Billy's physical and mental health and his actions from, inter alia, Katherine, William, John G. Tierney, M.D., a psychiatrist, and Douglas B. Cooper, Ph.D., a clinical psychologist. William also introduced into evidence notes from Kristin R. Krueger, Ph. D., a psychologist who treated Billy. Dr. Krueger's April 22, 2010 notes read as follows:

Overall, therapy is limited by [patient]'s disorganized thinking. He had a difficult time following conversations and at times abruptly began talking about a nonrelated issue. He often contradicts himself within the same sentence. ... The issue of [patient]'s capacity to man-

age his medical care is in question, secondary to his cognitive deficits.

Doctors Tierney and Cooper provided expert testimony on Billy's physical and mental health. Neither doctor interviewed Billy or treated him as a patient. Instead, they based their opinions on their reviews of Billy's medical and administrative records.

a. Dr. Tierney

Dr. Tierney testified that Billy's diagnoses included major depression, PTSD, ADD, alcohol abuse, marijuana use, and progressive multiple sclerosis. He testified about Billy's medical condition and mental state: Billy's MS was progressive; he was in chronic pain; the disease degraded, and was continuing to degrade, Billy's cognitive abilities; it atrophied his brain; and his cognitive function tests indicated prominent deficits including in executive function. Dr. Tierney explained to the jury what prominent defects in cognitive function are, what executive function is, and how prominent cognitive deficits and degraded executive function affect decision-making ability. Finally, Dr. Tierney opined that Billy lacked the mental capacity to consent to marriage.[3]

b. Dr. Cooper

Dr. Cooper was asked whether Billy had the mental capacity to consent to marriage. Dr. Cooper testified that he careful-

---

**3.** Over timely objections of "not based on scientific evidence or proper evaluations," Dr. Tierney and Dr. Cooper testified that Billy lacked the mental capacity to consent to marriage. "No witness, whether expert or nonexpert, is permitted, over *proper* objection, to state his opinion as to the legal capacity of a person to make a will, because the determination of the existence of testamentary capacity involves the application of a legal definition to the facts." *Lindley v. Lindley,* 384 S.W.2d 676, 682 (Tex.1964) (emphasis added); *accord Carr v. Radkey,* 393 S.W.2d 806, 813 (Tex.1965);

*Storey v. Hayes,* 448 S.W.2d 179, 182 (Tex. Civ.App.–San Antonio 1969, writ dism'd). But "competent evidence about [a person's] mental condition and mental ability or lack of it which does not involve legal definitions, legal tests, or pure questions of law should be admitted." *Carr,* 393 S.W.2d at 813. A qualified expert witness may testify as to whether a person "had the capacity to know the objects of his bounty, the nature of the transaction in which he was engaged, the nature and extent of his estate, and similar questions." *Id.*

ly examined "a large volume" of medical and administrative records pertaining to Billy. Dr. Cooper explained the significance of the records he reviewed and the relationship between cognitive functioning and mental incapacity. Over objection, Dr. Cooper opined that "Billy Matthews did not have capacity to understand the roles and responsibilities of a marriage at the time he entered into that contract."

### 3. Legal Sufficiency of Mental Capacity Evidence

Katherine argues the evidence is legally insufficient to support the jury's finding that Billy lacked the mental capacity to consent to marriage.

The jury reviewed evidence that included expert witness testimony that Billy suffered from depression, PTSD, ADHD, and progressive MS; the MS had atrophied, and was still atrophying, his brain and it affected his cognitive abilities; Billy manifested prominent cognitive deficits; and his executive function was impaired. The evidence also included William's testimony and other evidence of Billy's lack of capacity.

Viewing all the evidence in the light most favorable to the verdict, crediting and disregarding the evidence as required, we conclude the evidence was legally sufficient to support the jury's finding that Billy lacked the capacity to consent to marriage and understand the nature of the marriage ceremony. *See City of Keller*, 168 S.W.3d at 822, 827; *see also Graham Cent. Station*, 442 S.W.3d at 263.

### 4. Factual Sufficiency of Mental Capacity Evidence

Katherine also argued the evidence was factually insufficient to support the jury's finding that Billy lacked the mental capacity to consent to marriage. Katherine's burden was to "demonstrate there is insufficient evidence to support the adverse finding," *Flying J Inc.*, 373 S.W.3d at 691 (citing *Croucher*, 660 S.W.2d at 58), and "'the evidence which supports the jury's finding is so weak as to [make the finding] clearly wrong and manifestly unjust.'" *Id.* (quoting *Star Enter.*, 61 S.W.3d at 462; *Kerckhoff v. Kerckhoff*, 805 S.W.2d 937, 939 (Tex.App.–San Antonio 1991).

The jury heard conflicting evidence regarding Billy's mental capacity to consent to marriage and whether he understood the nature of marriage. The jury could have disbelieved the evidence that Billy had the mental capacity to consent and understood the nature of the marriage ceremony and believed the evidence that Billy lacked the mental capacity to consent and that he did not understand the nature of the marriage ceremony. *See Villarreal*, 446 S.W.3d at 411; *Ruiz*, 293 S.W.3d at 718.

We conclude there was sufficient evidence to support the jury's finding and the evidence was not so weak as to make the finding clearly wrong and manifestly unjust. *See Flying J Inc.*, 373 S.W.3d at 691 (citing *Croucher*, 660 S.W.2d at 58).

Because the evidence was legally and factually sufficient to support the jury's finding that Billy lacked the mental capacity to consent to marriage, we need not address Katherine's issues pertaining to undue influence.

### Conclusion

Having reviewed the evidence under the appropriate standards of review, we conclude the evidence was legally and factually sufficient to support the trial court's order setting aside the Rule 11 agreement and vacating its order approving the settlement agreement. After the settlement agreement was set aside, William's claims were again at issue, and there was a live controversy.

Because Katherine failed to properly challenge William's status as an interested person, she waived her complaint against his capacity to bring a suit to annul the marriage. We conclude the trial court had subject matter jurisdiction to decide the claims.

We also conclude the evidence was legally and factually sufficient to support the jury's finding that Billy lacked the mental capacity to consent to marriage and understand the nature of the marriage ceremony. Thus, the trial court did not err in rendering judgment voiding Billy and Katherine's marriage.

We overrule each of Katherine's issues and affirm the trial court's judgment.