

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

---

No. 07-24-00075-CV

---

MARGARET HOSSEINI-BROWDER, APPELLANT

V.

ARMANDO MENDEZ, JOSUE SANTIAGO, AND WE CARE WILDLIFE SANCTUARY, APPELLEES

---

On Appeal from the 198th District Court
Bandera County, Texas
Trial Court No. 33 No. CVOC-20-0000101, Honorable Dennis Powell, Presiding

---

June 26, 2025

MEMORANDUM OPINION

Before PARKER and DOSS and YARBROUGH, JJ.

Appellant, Margaret Hosseini-Browder sued Appellees Armando Mendez, We Care Wildlife Sanctuary (WCWS), and Josue Santiago over ownership of two capuchin monkeys—"Malcolm" and "Elvis," and disputes involving income tax and business services. From these core issues arose multiple claims and counterclaims. Hosseini-Browder sued for breach of contract, violation of the Texas Theft Liability Act[1] (TLA),

---

[1] TEX. CIV. PRAC. & REM. CODE ANN. §§ 134.001–.005 (TLA).

1

intentional infliction of emotional distress, and defamation per se. Mendez filed a counterclaim against Hosseini-Browder alleging, *inter alia*, defamation, violations of the DTPA[2] and fraud. WCWS also brought a counterclaim alleging similar claims.

The trial court granted summary judgment for Mendez and WCWS on all of Hosseini-Browder's claims except breach of contract. Hosseini-Browder obtained a default judgment that was rendered against Santiago, and that case was severed.

After Hosseini-Browder withdrew her breach of contract claim, Mendez's and WCWS's claims for defamation, fraud, and DTPA violations proceeded to trial before a jury. The jury found against Mendez and WCWS on their fraud claim but returned a unanimous verdict in their favor on their defamation and DTPA claims. The trial court signed a judgment on November 3, 2023, awarding Mendez and WCWS in excess of $1.4 million; it overruled Hosseini-Browder's motion for new trial.

This appeal followed.[3] For the reasons discussed below, we affirm the take-nothing summary judgment on Hosseini-Browder's claim for violations of the TLA claim. We affirm the final judgment in favor of Mendez and WCWS for their defamation claims. We reverse and render a take-nothing judgment on Mendez's DTPA claims, and reverse and remand for a new trial WCWS's DTPA claims. We also remand for proper segregation of recoverable attorney's fees, if any.

---

[2] Texas Deceptive Trade Practices—Consumer Protection Act (DTPA), TEX. BUS. & COM. CODE ANN. §§ 17.41–.63.

[3] This appeal was originally filed in the Fourth Court of Appeals and was transferred to this Court by a docket-equalization order of the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001. In the event of any conflict, we apply the transferor court's case law. TEX. R. APP. P. 41.3.

**BACKGROUND**

This dispute arose from the relationship between exotic animal owners in Texas and Florida. In March 2016, Mendez formed WCWS as a non-profit wildlife sanctuary in Florida. In 2017, Malcolm the monkey was donated to WCWS.

In March 2018, Hosseini-Browder allegedly persuaded Mendez and his partner, Santiago, to move WCWS from Florida to Texas. Mendez delivered Malcolm to Hosseini-Browder for temporary care while WCWS completed its move to Texas. This was performed pursuant to a "transfer of ownership" agreement prepared by Hosseini-Browder and executed by her, Mendez, and Santiago. The parties dispute whether this document transferred ownership or merely granted temporary possession. What is undisputed is that approximately three months later, Hosseini-Browder returned Malcolm to Mendez and WCWS.

Hosseini-Browder allegedly represented to Mendez and WCWS that she was a CPA and tax expert who could assist with their federal tax returns and help establish WCWS as a nonprofit entity in Texas. According to WCWS's allegations, Hosseini-Browder had been criminally convicted in April 2018 of preparing false and fraudulent federal tax returns and was prohibited from providing tax advice during a five-year probation period. WCWS alleges Hosseini-Browder failed to disclose this conviction when she offered tax services.

The parties' relationship deteriorated in 2020. In February 2020, Hosseini-Browder placed her monkey, Elvis, with WCWS. When Hosseini-Browder demanded the return of Elvis and Malcolm, disputes arose over ownership of both primates.

3

After this falling out, Hosseini-Browder allegedly published statements on social media claiming that Mendez stole monkeys, was a drug addict, and did not properly care for the animals at WCWS.  She also allegedly contacted WCWS donors and supporters directly with these allegations.  These statements form the basis of the defamation claims that proceeded to trial.

## ANALYSIS

### I. Hosseini-Browder's Claims Under the Theft Liability Act

Hosseini-Browder argues the trial court erred by granting Appellees' motions for summary judgment[4] on her claim under the TLA.  In her live petition, she alleged Malcolm and Elvis were unlawfully appropriated by Appellees.

Under the TLA, a person "who commits theft is liable for the damages resulting from the theft."  TEX. CIV. PRAC. & REM. CODE ANN. § 134.003.  In relevant part, the statute defines theft as unlawfully appropriating property as described by §§ 31.03 through 31.07 and 31.11 through 31.14 of the Texas Penal Code.  *Id*. at § 134.002(2).  Of those sections, only Penal Code § 31.03 is potentially relevant here.  It provides that a person commits theft if he unlawfully appropriates property with intent to deprive the owner of it.  TEX. PENAL CODE ANN. § 31.03(a).  The intent to deprive must exist at the time of the taking or exchange.  *First State Bank, N.A. v. Morse,* 227 S.W.3d 820, 826 (Tex. App.—Amarillo 2007, no pet.).  Voluntary transfers do not constitute theft under the Act unless there is

---

[4] We review summary judgments de novo according to well-established standards that require no reiteration here.  *See Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 45 (Tex. 2017).

proof of intent to deceive at the time. *Id. Hughes v. Montee,* No. 05-15-00129-CV, 2016 Tex. App. LEXIS 7635, at *11 (Tex. App.—Dallas July 18, 2016, pet. denied) (mem. op.).

The summary judgment record contains Hosseini-Browder's March 2020 affidavit filed with her original petition. In relevant part, it states that in February 2020 she "entered into a binding agreement with Armando Mendez whereby he and Josue Santiago represented that they would care for Elvis while I was working with my tax preparation business through tax season."

On appeal, Hosseini-Browder argues her ownership of Elvis was never disputed; she refers to the 2018 "transfer of ownership" agreement as proof that she also held title to Malcolm. However, these arguments are not material to the summary judgment issues. Under relevant Texas law, an "owner" is defined to include those with title and with those holding possession. TEX. PENAL CODE ANN. § 1.07(35). There is no summary judgment evidence that Appellees intended to deprive Hosseini-Browder of any title to monkeys at the time she transferred possession to them.[5] Because the summary judgment record is conclusive that these transfers were voluntary at the time they occurred, Appellees did not unlawfully appropriate property claimed by Hosseini-Browder as a matter of law.

Within her summary judgment argument, Hosseini-Browder also complains the trial court abused its discretion by sustaining oral objections and excluding certain documents from the summary judgment record. Because the substance of these documents would not change our conclusion that Appellees did not violate the Act as a

---

[5] Moreover, when there exists a bona fide dispute about the who owns property, the evidence is legally insufficient to sustain a theft conviction. *See Bokor v. State*, 114 S.W.3d 558, 560 (Tex. App.—Fort Worth 2002, no pet.).

matter of law, it is unnecessary to reach the merits of this evidentiary complaint. TEX. R. APP. P. 44.1(a). Hosseini-Browder's first issue is overruled.

## II. Appellees' Defamation Claims

By her next issue, Hosseini-Browder asserts the jury's findings that she defamed Appellees were not supported by sufficient evidence. The defamation findings were that Hosseini-Browder falsely published statements that Mendez stole a monkey, did not properly care for animals at WCWS, and was a drug addict. The jury made similar related findings concerning statements Hosseini-Browder published about WCWS.

A party challenging the legal sufficiency of an adverse finding on which it did not have the burden of proof at trial must show no evidence supported the challenged finding. *Graham Cent. Station, Inc. v. Pena,* 442 S.W.3d 261, 263 (Tex. 2014) (per curiam). We view the evidence in the light most favorable to the verdict, "crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *In re Est. of Matthews,* 510 S.W.3d 106, 117 (Tex. App.—San Antonio 2016, pet. denied) (cleaned up). "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex. 2005).

When a party challenges the factual sufficiency of an adverse finding on which it did not have the burden of proof, it must show there is insufficient evidence to support the finding. *Laredo Tex. Hosp. Co., L.P. v. Cabrera,* No. 04-24-00028-CV, 2024 Tex. App. LEXIS 8559, at *8–9 (Tex. App.—San Antonio Dec. 11, 2024, no pet.) (mem. op.); *In re Marriage of Thrash,* 605 S.W.3d 224, 230 (Tex. App.—San Antonio 2020, pet. denied).

6

We examine all the evidence but may not reverse unless "the evidence which supports the jury's finding is so weak as to be clearly wrong and manifestly unjust." *Flying J Inc. v. Meda, Inc.,* 373 S.W.3d 680, 690–91 (Tex. App.—San Antonio 2012, no pet.) (cleaned up).

A defamation claim requires proof of four essential elements: (1) a false statement of fact was published to a third party without legal excuse, (2) that was defamatory concerning the plaintiff, (3) that was made with the requisite degree of fault, and (4) damages. *Durant v. Anderson,* No. 02-14-00283-CV, 2020 Tex. App. LEXIS 2319, at *52 (Tex. App.—Fort Worth Mar. 19, 2020, pet. denied) (mem. op.).

### 1. Statements that Mendez stole a monkey and WCWS possessed a stolen monkey

Hosseini-Browder argues her statement that Mendez "stole" a monkey was substantially true, and that the jury's findings lack factually sufficient evidence. The charge defined "substantially true" as a statement that "in the mind of the average person, is no more damaging to the person affected by it than a literally true statement would have been." *See also Dall. Morn. News v. Tatum*, 554 S.W.3d 614, 641 (Tex. 2018); *Consultants in Pain Med. v. Duncan, PLLC*, 690 S.W.3d 739, 757 (Tex. App.—San Antonio 2024, pet. denied). We disagree with Hosseini-Browder: words accusing someone of committing a crime carries more potential for reputational damage than saying they are in a custody dispute over an animal.

Hosseini-Browder's claim that Mendez "stole" Elvis was disputed by Mendez and other witnesses. Even Hosseini-Browder testified that she voluntarily left Elvis at WCWS. When Hosseini-Browder requested Elvis's return, Mendez did not refuse but attempted

7

to meet the request. The problem was compounded when Hosseini-Browder's daughter, Cricket, contacted law enforcement claiming ownership of Elvis and seeking his return. Veterinarian Stephen Sells testified that Mendez called him to assist in capturing Elvis at the WCWS compound. Elvis was eventually captured and returned to Hosseini-Browder. The jury had the opportunity to resolve the conflicting evidence and determine the veracity of Hosseini-Browder's remarks.

As for Malcolm, the evidence is conflicting, permitting the jury's resolution of evidence and assessment of credibility. Malcolm was not originally claimed by Hosseini-Browder in her original petition. The evidence shows Hosseini-Browder acknowledged he belonged to Mendez. As an example, when WCWS senior board member Carol Bolte visited Hosseini-Browder in 2018 and inquired about Malcolm, Hosseini-Browder explained she "was just babysitting him for" Mendez while he moved to Texas. Appellant never told her she owned Malcolm but was "watching" him.

*2. Statements that "Mendez did not properly care for the animals" and WCWS was "not taking care of the animals."*

We agree with Hosseini-Browder that conclusions Mendez and WCWS did not properly take care of the animals is a statement of opinion because it is not susceptible of being proven true or false given the entire context. *See Bentley v. Bunton*, 94 S.W.3d 561, 581 (Tex. 2002) (adopting test from *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 21 (1990)). Whether a statement is an opinion is a question of law. *Scripps NP Operating, LLC v. Carter*, 573 S.W.3d 781, 794–95 (Tex. 2019). Specifically, statements of individual judgment that "rest[] solely in the eye of the beholder" are non-actionable statements of opinion. *See Mogged v. Lindamood*, No. 02-18-00126-CV, 2020 Tex. App. LEXIS 9445,

8

at *44 (Tex. App.—Fort Worth Dec. 3, 2020, pet. denied) (mem. op.); *Falk & Mayfield, L.L.P. v. Molzan*, 974 S.W.2d 821, 824 (Tex. App.—Houston [14th Dist.] 1998, pet. denied).

Animal care, like beauty, lies in the eye of the beholder. When we construe Hosseini-Browder's statements as a whole and in light of the surrounding circumstances based on how a person of ordinary intelligence would receive them, we conclude that her remarks about the level of care provided by Mendez and WCWS constitute non-actionable opinion. *See Yiamouyiannis v. Thompson*, 764 S.W.2d 338, 341 (Tex. App.—San Antonio 1988, writ denied). What constitutes "proper" care for exotic animals involves subjective judgments about standards, methods, and priorities that reasonable people can debate.

Moreover, the statements do not imply assertions of objective fact. In *Yiamouyiannis*, the court explained that references to someone as "a quack, a hoke artist, and a fearmonger" were "assertions of pure opinion" and "vintage hyperbole" not "capable of proof one way or the other." 764 S.W.2d at 341. The terms were "the speaker's shorthand way of opining" about credibility and qualifications rather than statements of verifiable fact. *Id.* Similarly, Hosseini-Browder's criticisms of animal care standards represent her subjective assessment rather than assertions capable of objective verification.

*3. Statements that Mendez is a drug addict*

Mendez's uncontroverted testimony was that he did not use drugs or alcohol. Hosseini-Browder did not testify to any personal knowledge of Mendez using drugs.

9

Other than a photograph of marijuana paraphernalia[6] that was not shown to belong to Mendez, there was no evidence showing the substantial truth of Hosseini-Browder's claim that Mendez is a drug addict. The jury found it was not substantially true based on the uncontroverted testimony.

*4. Whether the statements can be imputed to WCWS*

Hosseini-Browder argues that no witness testified she made false statements about WCWS. Several witnesses testified, however, of false disparaging statements made by Hosseini-Browder concerning WCWS. For example, Carol Bolte testified Appellant made negative statements in social media posts about WCWS to its donors, contractors, and subcontractors, resulting in a loss of donors, donations, and volunteers. She characterized the statements generally as "This is who you're donating to," followed by disparaging remarks about Mendez and WCWS.

*5. Award of damages for Mendez*

Hosseini-Browder argues the evidence fails to meet legal standards required for liability and damages in defamation cases. For example, she argues that the jury's awards do not comport with those categories of damages traditionally recognized in defamation cases. But this case was decided by a jury using a specific charge that contained only broad-form damage questions asking for money to "fairly and reasonably compensate [plaintiff] for the damages, if any" resulting from defamation. The jury

---

[6] Even Hosseini-Browder must hedge her conclusion on this point. She argues the photo "reasonably appears to be a sufficient number of 'weed' bongs and pipes to suggest *possible* drug addiction." (emphasis added). But that equivocal assessment bears no resemblance to her unqualified public accusation that Mendez is a drug addict. It is the difference between "maybe" and "definitely."

received no guidance on specific damage items, calculation methods, or legal standards for assessing damages. Moreover, the charge directed jurors to the same damage question regardless of whether they answered "yes" to one, two, or all three defamation findings for each plaintiff. Because no party objected to this charge, we measure the sufficiency of evidence against the charge as given—not against legal standards found elsewhere. *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000); *Pena v. Guerrero*, No. 04-19-00874-CV, 2020 Tex. App. LEXIS 9565, at *14 (Tex. App.—San Antonio Dec. 9, 2020, no pet.) (mem. op.); *see also* TEX. R. CIV. P. 274.

"Defamation per se refers to false statements so obviously harmful that general damages may be presumed. General damages ordinarily include non-economic losses, such as mental anguish and loss of reputation." *Anderson v. Durant*, 550 S.W.3d 605, 618 (Tex. 2018). When damages are for non-economic losses, the jury must be given latitude because these general damages are incapable of precise mathematical measure. *Brady v. Klentzman*, 515 S.W.3d 878, 886 (Tex. 2017).

Mendez testified that following Hosseini-Browder's negative social media posts and contacts with WCWS's donors, contractors, volunteers, and supporters, he became "like a recluse" and experienced anxiety, depression, and sleepless nights worrying over how WCWS could "stay afloat." Other witnesses testified regarding facts showing that Mendez suffered mental anguish after the defamation. Bolte testified that when she first met Mendez he "was very outgoing . . . very personable" but after the defamation "he's been very stressed." Roxanne Salinas testified that it has been a "very stressful three years" for Mendez and he was "stressed out and things that people say about him is just upsetting because it is not true."

11

Because of the breadth of the damage question, the jury was permitted to base its monetary finding on whichever defamation findings it chose and in accordance with virtually no guidance on what items of damages could be considered. Unlike specific damage elements common to defamation cases—like mental anguish, loss of reputation, or economic harm—this broad-form question gave the jury complete discretion to determine the categories of damages, the criteria for assessing them, and their monetary value. The charge's only reference to causation was equally broad, asking for damages "as a result of defamation" without any standard for how to assess cause and effect. This ethereal causation standard and the expansive evidentiary framework prevents the Court from parsing which defamation findings contributed to a particular award or whether the jury followed conventional damage calculations at all. We conclude legally and factually sufficient evidence supported the amount of the jury's damage finding under this broad standard. Moreover, an award of mental anguish damages in the amount of $95,998 was not excessive given the jury's wide latitude to assess harm from any or all defamatory statements.

*6. Award of damages for WCWS*

An identical broad-form damage question was posed for WCWS, giving the jury the discretion to determine categories of damages, assessment criteria, and monetary value without specific guidance.[7] The evidence showed comprehensive harm to WCWS's operations and reputation.

---

[7] In addition, the damages question was predicated on a "Yes" answer for any defamation of WCWS *and/or Mendez*.

Before Hosseini-Browder's remarks, WCWS was described as a "great place," "peaceful," "therapeutic," and "very clean and safe." Mendez testified it was "a place where people could actually see animals and interact with animals—where people were excited to come out and bring their friends and family from out of town." After Hosseini-Browder's campaign, "it went to nothing." Mendez testified that WCWS's reputation "tanked," and people in the community became "skeptical" and "just mean." One family told WCWS they "could not be associated with We Care until this all got taken care of" because of concerns at their children's Christian school.

Evidence shows Hosseini-Browder contacted donors directly by telephone and Facebook messenger, telling supporters not to leave their animals at WCWS. Board member Maritza Martinez testified donations were stable from 2018 until 2020, when they went down "significantly" and "real quick." WCWS was told Hosseini-Browder was "reaching out to people to stop the donations." Due to lost donations, WCWS became unable to fully pay veterinary and other necessary bills.

Bolte testified WCWS lost over fifty percent of their volunteers after Hosseini-Browder's statements. Five or six families specifically told WCWS they would not return to volunteer because of the defamatory statements. For example, volunteer and fundraiser Alicia Alaniz testified her family had planned significant involvement with WCWS but decided "to not pursue that" after the negativity. As Alaniz explained, "What I was trying to do was protect my family. So I removed my family from getting mixed up any deeper into that type of environment."

13

Given the broad damage question's lack of constraints on both damage categories and causation, coupled with evidence of comprehensive harm to reputation, economic standing, and community support flowing from Hosseini-Browder's defamatory campaign, we conclude the $168,000 award was supported by legally and factually sufficient evidence and was not excessive. As with Mendez's award, the jury could base WCWS's damages on any defamatory statement it found proven, providing multiple pathways to justify the monetary award.

*7. Complaints of evidentiary rulings*

Within this issue, Hosseini-Browder complains the trial court committed error through two evidentiary rulings. We review a trial court's ruling admitting or excluding evidence for an abuse of discretion. *Estate of Denman,* 362 S.W.3d 134, 140 (Tex. App.—San Antonio 2011, no pet.). An abuse of discretion occurs when a trial court acts without reference to any guiding rules or principles; that is, arbitrary and unreasonable. *Cire v. Cummings,* 134 S.W.3d 835, 838–39 (Tex. 2004). To obtain reversal for an erroneous exclusion or admission of evidence, the appellant must establish the error was harmful—that it was calculated to cause and probably did cause the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1(a)(1); *Estate of Denman,* 362 S.W.3d at 141. "Errors in admission or exclusion of evidence are generally not reversible unless the appellant can show the whole case turns on the complained of evidence." *Estate of Denman,* 362 S.W.3d at 141 (cleaned up).

First, Hosseini-Browder complains about the trial court's exclusion of one of her Facebook posts. Under Rules of Evidence 401 and 403, the trial court excluded any

14

reference to a 2018 Florida charge alleging that Mendez and Santiago had falsely reported the theft of WCWS's animals to police. The court also excluded a link to a news story entitled "woman reunited with pet monkey," above which Hosseini-Browder posted "I see I'm not the only one they've done this to." And the court excluded several paragraphs of discussion whereby Hosseini-Browder explains Mendez's and Santiago's history in other states.

We fail to see how such evidence is relevant given the remaining causes of action being litigated at trial. However, in light of the jury charge—which allowed the jury to find she had defamed Mendez and WCWS in a variety of ways—we further fail to see how the court's evidentiary ruling, even if in error, probably resulted in an improper judgment. *See* TEX. R. APP. P. 44.1(a)(1).

Second, Hosseini-Browder complains about improper rebuttal testimony. The trial court allowed Cricket, Hosseini-Browder's daughter, to testify in rebuttal; her testimony suggested that Elvis belonged to her, not Hosseini-Browder. Cricket testified that when Elvis came as a rescue to Hosseini-Browder, her mother told her "if I took on all the care, that he would belong to me and he was my responsibility." Hosseini-Browder argues this testimony was material to Appellees' case-in-chief and should not have been presented only in rebuttal. She further contends Cricket's testimony was factually insufficient to establish ownership because any purported gift was conditional, Cricket never mutually assented to the terms, and the timeframe of the alleged conversation was too vague for the jury to rely upon.

15

However, the judgment awards damages based on multiple defamation findings: that Hosseini-Browder published statements claiming Mendez was a monkey thief and was a drug addict. Because of the charge structure, Appellees could have prevailed on other findings without considering Cricket's possible ownership. Appellant cannot show the admission of this evidence affected "the whole case." *See Denman*, 362 S.W.3d at 141. Accordingly, even if the trial court erroneously allowed Cricket's rebuttal testimony, Hosseini-Browder has not shown reversible error. *See* TEX. R. APP. P. 44.1(a)(1).

## III. Claims Under the Deceptive Trade Practices Act

By her next issue, Hosseini-Browder argues the jury's liability and damages findings for violations of the Texas DTPA are not supported by legally and factually sufficient evidence.

According to Appellees, Hosseini-Browder engaged in false, misleading, or deceptive acts and unconscionable conduct violating the DTPA. They claim to have relied upon false representations that she was a certified public accountant, a tax expert, and capable of setting up WCWS to operate in Texas as a not-for-profit LLC. They further point to her failure to disclose a federal conviction—with five-year prohibition including a prohibition on giving tax advice—for preparing false and fraudulent tax returns as an unconscionable action. *See* TEX. BUS. & COM. CODE ANN. § 17.45(5)(A) (taking advantage of a consumer's lack of knowledge, ability, experience, or capacity to a grossly unfair degree). Hosseini-Browder does not dispute that her actions violated the DTPA. She argues instead that her conduct did not cause the claimed injuries or warrant the jury's damage award.

The DTPA grants consumers a cause of action for false, misleading, or deceptive acts or practices. *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996); *see* TEX. BUS. & COM. CODE ANN. § 17.50(a). To prevail on a DTPA claim, the plaintiff must prove: (1) it was a consumer; (2) the defendant either engaged in false, misleading, or deceptive acts[8] or engaged in an unconscionable action or course of action; and (3) the DTPA violation or unconscionable action was a producing cause of the plaintiff's injury. *Amstadt*, 919 S.W.2d at 649; *Sadler v. Tex. Farm Bureau Mut. Ins. Cos.,* No. 04-12-00789-CV, 2013 Tex. App. LEXIS 11300, at *5–6 (Tex. App.—San Antonio Sept. 4, 2013, no pet.) (mem. op.). At trial, the jury instructions required proof of producing cause, but the damages questions asked for damages *proximately caused* by Hosseini-Browder's conduct.[9] Again, because no party objected to the jury charge's use of proximate causation for damages, that becomes the governing standard on appeal.

The jury awarded Mendez $2 (which the judgment doubled to $4), for Hosseini-Browder's knowing false, misleading, or deceptive representations or unconscionable conduct. The record contains no evidence, however, that any violation of the DTPA was the proximate cause of damage to Mendez individually. When asked at trial if he had an issue with preparation of his personal tax returns, Mendez stated, "no, there was no issue." Further, he made no claim of suffering mental anguish as a result of a DTPA

---

[8] Section 17.46(b) of the DTPA provides a "laundry list" of per se deceptive trade practices. *See Hurst v. Sears, Roebuck & Co.,* 647 S.W.2d 249, 251 (Tex. 1983).

[9] Under the DTPA, a plaintiff must produce evidence showing an "unbroken causal connection" between the actionable misrepresentation and the injury. *James V. Mazuca & Associates v. Schumann*, 82 S.W.3d 90, 95 (Tex. App.—San Antonio 2002, pet. denied) (*quoting Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 478 (Tex.1995)). Proximate cause, by contrast, requires proof of both cause in fact and foreseeability. *Tenaris Bay City Inc. v. Ellisor*, No. 23-0808, 2025 Tex. LEXIS 423, at *6 (Tex. May 23, 2025). Cause in fact has two components: the defendant's conduct must be both a "but for" cause (without which "the harm would not have occurred") and "a substantial factor in bringing about an injury." *Id.* (cleaned up).

17

violation by Hosseini-Browder.  We sustain Hosseini-Browder's third issue as it pertains to Mendez's individual DTPA claim and render judgment that Mendez take nothing by that claim.

Regarding WCWS's DTPA claim, Hosseini-Browder argues there is legally and factually insufficient evidence of any connection between any DTPA violations and the jury's damages award of $336,000.  She contends that the March 2020 "falling out" between the parties was an intervening cause that cuts off any liability, and that WCWS's own failure to hire accountants or file returns for four years after the dispute began was the real cause of its problems.  Additionally, she argues that many of the claimed damages are either speculative, not recoverable under the DTPA, or relate to a separate legal entity (the LLC) for which WCWS has no standing to recover.

WCWS argues the evidence supporting the jury award for DTPA damages included:

- Loss of donations, including the Bingo project donations
- Cost to hire tax professional to correct problems created by Hosseini-Browder
- Cost to recreate documents wrongfully withheld by Hosseini-Browder

We discuss this evidence below.

*1. Lost donations*

WCWS points to several examples of how Appellant's alleged DTPA violations caused injury.  For instance, Appellees called Sasha Wengler, who operates an animal sanctuary similar to WCWS, to testify about potential lost fundraising opportunities.

18

According to Wengler, certain bingo parlors select nonprofit organizations as beneficiaries for their events, with participating nonprofits receiving donations ranging from $60,000 to $120,000 every quarter. She recommended the opportunity to WCWS.

Wengler testified that WCWS initially could not participate "because there were a lot of interruptions" and delays in getting an application approved, allegedly due to Hosseini-Browder's actions and withheld documents. She believed WCWS might now participate in such a program but was uncertain.

Despite this testimony, there is no evidence that WCWS was ready, willing, or able to participate in any bingo program at the time. This testimony presents no reasonable degree of certainty regarding any lost monetary benefit. *See Sw. Battery Corp. v. Owen*, 131 Tex. 423, 115 S.W.2d 1097, 1098 (1938). The claimed lost bingo revenue was remote, uncertain, and purely conjectural, and amounts to no evidence at all. *See Arthur Andersen & Co. v. Perry Equip.*, 945 S.W.2d 812, 816 (Tex. 1997).

In addition, the evidence reveals that Mary Smith was WCWS's largest donor, contributing between $1.5 to $2 million for real property, improvements, animal feed, and a swimming pool. She testified she ceased donating because "I think it was towards the end where the pool was built and, you know, got a notice about that bill and pretty much realized I was being taken advantage of [by WCWS] at that point." Importantly, Smith had already ceased donating when she first met Hosseini-Browder in February 2021. During her testimony, Smith specifically acknowledged Hosseini-Browder was not the reason she stopped donating to WCWS.

Like the bingo revenue evidence, the evidence regarding Smith's donations fails to show how Hosseini-Browder's DTPA violations was the cause of lost donations from Smith. Likewise, we find no evidence that her actionable DTPA violations were the cause of other lost donations to WCWS. Accordingly, we conclude there is no evidence that WCWS lost donations as a result of Hosseini-Browder's DTPA violations.

*2. Cost of remedial accounting services and reconstruction of withheld documents*

WCWS also claims DTPA damages from two related sources: the cost to recreate financial documents that Hosseini-Browder allegedly withheld, and the cost of remedial accounting services to correct the problems her actions created.

Several witnesses testified about problems caused by a banker's box of financial documents in Hosseini-Browder's possession. Appellees argue that her refusal to return these records made it impossible for WCWS to file its 2019 tax return and prevented filing subsequent returns.

At trial, CPA John Buxie was asked to estimate the cost of recreating the withheld documents. He declined to provide a firm estimate, explaining:

> Without knowing whatever the documents are, how much was there, how much went in the banks, how much was spent, it's really hard to say that. Normally, the minimum I charge is $300 a month for bookkeeping. So a minimum charge would have been $3,600 to do an annual 12 months of bookkeeping. I would say if we do it, it could take that much just trying to recreate the records, but it could be more. It's 150 bucks an hour.

We conclude this cost evidence for recreating missing records amounts to no more than surmise and speculation; as such, it was no evidence.

Buxie provided more concrete testimony about other costs, however. He testified that restoring WCWS's 501(c)(3) status would require preparation of tax returns for four years, gathering information for those returns, and filing form 1023 with the Internal Revenue Service. He estimated preparation of returns for each of the four tax years would cost $2,000 per year, and the filing fee for form 1023 would be $800. The record also shows WCWS paid a $100 fine to the Texas comptroller's office.

We conclude the noted dollar amounts Buxie testified to, along with the fine paid to the comptroller, constitute some evidence of an amount necessary to compensate WCWS for damages allegedly caused by Hosseini-Browder's DTPA violations. However, this total stands in gross disproportion to the $336,000 awarded by the jury. The evidence is factually insufficient to support the amount of damages awarded. We accordingly reverse the judgment and remand for a new trial of WCWS's DTPA claims against Hosseini-Browder. *See* TEX. R. APP. P. 44.1(b).

## IV. Attorney's Fees

In her final issue, Hosseini-Browder argues the trial court erred by awarding Mendez and WCWS improper and excessive attorney's fees. The requests for attorney's fees were tried to the bench. The trial court made three awards: (1) $166,575.50 to attorney Per Hardy for representing both Mendez and WCWS on their DTPA claims; (2) $48,195.00 to attorney George Carroll for representing WCWS on DTPA claims, defense of Hosseini-Browder's Theft Liability Act claim, and "inextricably intertwined claims"; and (3) conditional appellate fees.

*1. DTPA-related attorney's fees*

The DTPA provides that "[e]ach consumer who prevails shall be awarded court costs and reasonable and necessary attorneys' fees." TEX. BUS. & COM. CODE ANN. § 17.50(d). Because Mendez did not prevail on his individual DTPA claim and we are remanding WCWS's DTPA claims for a new trial, neither party currently qualifies as a prevailing consumer under the DTPA. *See Cordrey v. Armstrong,* 553 S.W.2d 798, 799 (Tex. Civ. App.—Beaumont 1977, no writ) (holding prevailing-consumer status entitling the plaintiff to recover attorney's fees under the DTPA requires the plaintiff obtain some relief by its suit such as an award of damages, restoration, or an injunction). We therefore reverse and render judgment that Mendez and WCWS[10] take nothing on their claims for DTPA attorney's fees.

*2. Theft Liability Act-related attorney's fees*

In addition, attorney's fees are potentially available under the Theft Liability Act. TEX. CIV. PRAC. & REM. CODE ANN. § 134.005(b). The trial court awarded WCWS $48,195.00 for attorney's fees covering DTPA claims, successful defense of Hosseini-Browder's Theft Liability Act claim, and "inextricably intertwined claims." However, because this award commingles fees for DTPA claims (which we reverse), Theft Liability Act defense (which WCWS won), and other claims, we vacate the $48,195.00 award. On remand, the trial court shall determine the proper amount attributable solely to WCWS's successful defense of the Theft Liability Act claim.

---

[10] Should WCWS prevail in its DTPA claims on remand, it may again seek attorney's fees under the statute.

## CONCLUSION

For the reasons stated, we affirm in part, reverse and render in part, and reverse and remand in part.

We affirm the trial court's summary judgment dismissing Hosseini-Browder's Theft Liability Act claim.

We affirm the judgment and award of damages to Mendez and WCWS on their respective defamation claims.

We reverse and render judgment that Mendez take nothing on his individual DTPA claim and DTPA attorney's fees.

We reverse and remand for: (1) a new trial on WCWS's DTPA claims; and (2) determination of the proper amount of attorney's fees attributable solely to WCWS's successful defense of the Theft Liability Act claim.


Lawrence M. Doss
Justice